UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


CHRISTOPHER BROWN,

     Plaintiff,

        v.                          Civ. No. 3:16-cv-00376(WIG)

DEPARTMENT OF CORRECTIONS, ET
AL,

      Defendants


## CORRECTED RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff Christopher Brown, a state prisoner, brings this four count complaint against thirteen employees of the Connecticut Department of Corrections, (together, the "Defendants") alleging violations of his Eighth and Fourteenth Amendment rights to the United States Constitution, pursuant to 42 U.S.C. §1983. (*See* Third Amend. Compl. ("TAC"), ECF No. 89). He alleges a violation of procedural due process rights by continual confinement in administrative segregation without meaningful periodic reviews and for unlawful regressions to Phase 1 of the Administrative Segregation Program, in violation of the Fourteenth Amendment. *Id.* ¶¶48, 49. He also alleges deliberate indifference to his mental health needs and deliberate indifference to unconstitutional conditions of confinement in violation of the Eighth Amendment. (ECF No. 89 ¶¶50, 51).

---

[1] This ruling has been amended solely to state the applicable standard of review in the conclusion section of the opinion at page 38.

Pending before the Court is Defendants' motion for summary judgment (ECF No. 172), to which Brown has objected. (ECF No. 183.) For the reasons set forth below, Defendants' motion is **GRANTED.**

## I.  DEFENDANTS

Plaintiff brings this action against thirteen Defendants: Scott Erfe, is/was the former Warden at Cheshire CI; William Mulligan, former Warden at NCI; Anne Cournoyer, former Warden at NCI; Jacqueline Bachan, Counseling Supervisor; Dr. Mark Frayne, Psychologist; Dr. Gerard Gagne, Psychiatrist; Jesse Johnson, Captain at Cheshire CI; Karl Lewis, Director of Offender Classification and Population Management; David Maiga, Acting Director of Offender Classification and Population Management; William Longo, Mental Health Social Worker at NCI; Edward Maldonado, District Administrator; Angel Quiros, District Administrator; and [first name omitted] Robles, Captain.

The claims against former Commissioner Scott Semple were dismissed by agreement on September 30, 2019. (ECF No. 114).

In response to Defendants' motion, Plaintiff agreed to the entry of summary judgment against certain Defendants and causes of action. Accordingly, summary judgment will enter as follows:

The Motion for Summary Judgment is **GRANTED** as to Defendants Maiga and Maldonado on the due process claims under the Fourteenth Amendment arising out of Plaintiff's initial A/S review. It is undisputed that Defendants David Maiga and Edward Maldonado were

not involved in Plaintiff's initial placement or the hearing process for Plaintiff's initial placement in A/S in 2013. (Def. 56(a)(1) Stat. ¶¶5, 6; Pl. 56(a)(2) Stat. ¶¶5, 6).

The Motion for Summary Judgment is **GRANTED** as to Defendants Dr. Frayne, Dr. Gagne and Counselor Longo on all due process claims under the Fourteenth Amendment arising out of Plaintiff's placement in Administrative Segregation. (TAC ¶¶48, 49). Plaintiff agrees that Defendants Dr. Frayne, Dr. Gagne and Counsel Longo "had no personal involvement in [Plaintiff's] initial placement in A/S, his A/S reviews, or his A/S regressions." (ECF No. 183-5 at 21, n. 2).

The Motion for Summary Judgment is **GRANTED** as to Defendants Johnson, Robles, Lewis and Bachan on the Eighth Amendment claim alleging deliberate indifference to mental health needs. (TAC ¶50). "Plaintiff agrees with Defendants' argument that this claim does not apply to Defendants Johnson, Robles, Lewis and Bachan." (ECF No. 183-5 at 22, n. 5).

The Motion for Summary Judgment is **GRANTED** as to all Defendants on the Eighth Amendment claim alleging deliberate indifference to unconstitutional conditions of confinement. (TAC ¶51). "Plaintiff acknowledges that he filed no grievances as to specific conditions of confinement required for adjudication of an Eighth Amendment claim…." (ECF No. 183-5 at 23).

Accordingly, the Court will address the supervisory liability claims against the remaining six Defendants: former District Administrator Quiros, former Warden Maldonado and Director of Offender Classification and Population Management Maiga on the Fourteenth Amendment procedural due process claims and the Eighth Amendment claims against former Wardens Erfe, Maldonado, Cournoyer and Mulligan alleging deliberate indifference to his mental health needs.

## II.   FINDINGS OF FACT

The following facts are drawn from the parties' Local Rule 56(a)(1) and 56(a)(2)

Statements of Undisputed Material Facts and exhibits in the record.

### Plaintiff Christopher Brown

At all times relevant to this lawsuit, Plaintiff, a state prisoner, was incarcerated at the

Cheshire Correctional Institution ("Cheshire CI"), located in Cheshire, Connecticut and at

Northern Correctional Institution ("NCI"), located in Somers, Connecticut.[2] (ECF No. 89, TAC

¶1). Inmates in the Administrative Segregation ("A/S") Program, Phase 1, were housed at NCI

and inmates in A/S, Phases 2 and 3, were housed at Cheshire CI.  (Local Rule 56(a)(1), ECF No.

172-1 ¶2; Local Rule 56(a)(2), ECF No. 183-1 ¶2).

### Fourteenth Amendment Claims against Defendants Quiros, Maiga, and Maldonado
### Initial Placement at NCI December 2013

Plaintiff was initially placed in A/S in November 2013. Def. 56(a)(1) ¶1; Pl. 56(a)(2)¶1.

At all times relevant to Plaintiff's Complaint, inmates in the A/S Program, Phase 1, were housed

at NCI and inmates in A/S, Phases 2 and 3, were housed at Cheshire CI. Def. 56(a)(1) ¶2; Pl.

56(a)(2)¶2.

Plaintiff was housed at NCI from December 3, 2013 through June 3, 2014; October 27,

2014 through March 3, 2015; and September 1, 2015 through January 9, 2017. (Def. Ex. L ¶3;

Pl. Ex. C; ECF No. 172-2 at 7, n.1; ECF No. 185-5 at 5 ).[3]

---

[2] Plaintiff alleges that he entered A/S at NCI on November 4, 2013. (TAC ¶21). This lawsuit was filed on March 7, 2016. (ECF No. 1). On summary judgment Plaintiff states that he entered A/S at NCI on December 3, 2013. (ECF No. 185-5 at 5).

[3] Plaintiff was housed at NCI for his final Phase 2 and Phase 3 term before he became eligible for transfer to general population on January 9, 2017. (Pl. Ex. F at 56-57; Pl. Ex CC).

In a declaration submitted in support of summary judgment District Administrator Angel Quiros avers that he was not directly involved in the recommendation or approval of Plaintiff's placement in A/S in 2013. (Def. Ex. B ¶6). Warden Scott Erfe sent a memo dated November 4, 2013, to D.A. Angel Quiros and Director of OCPM Karl Lewis "recommend[ing]" that inmate Brown be placed in the A/S program at NCI due to his involvement in a serious physical assault on November 3, 2013, "in which he was the aggressor." (Def. Ex. B, Attach. 1). The recommendation was approved by the Director of OCPM Karl Lewis on November 4, 2013, stating "transfer [] pending due A/S hearing/placement." *Id.*

As the District Administrator, Quiros avers that he was not directly involved in *any* inmate's placement in A/S. The recommendation and hearing process for A/S placement occurs at the facility level with additional levels of approval but does not require District Administrator involvement. *Id.* ¶4. The final approval or denial of A/S placements was completed by the Director of Offender Classification and Population Management (OCPM). At all times relevant to this lawsuit the Director of OCPM was either Karl Lewis or David Maiga. *Id.* ¶5. Quiros was not directly involved in the recommendation or approval for the Plaintiff's placement in A/S in 2013, and he was not involved in the hearing process for Plaintiff's placement in A/S in 2013. *Id.* ¶6). Although he was copied on a letter noting the recommendation for Plaintiff to be placed on A/S, *id.* ¶7, Attach. 1, he did not approve the Plaintiff's placement in A/S as it was not his responsibility to do so, nor did he have authority to deny or approve the placement. *Id.* ¶7.

Finally, it is undisputed that Plaintiff was initially placed on A/S only after receiving "notice, a hearing, and an opportunity to be heard." (ECF No. 183-5 at 5 ("Plaintiff was formally placed in A/S on December 3, 2013, following notice, a hearing and an opportunity to be heard.").

**Progression, Regression and Periodic Reviews**

   **Defendant Angel Quiros**

At all times relevant to this case, Angel Quiros was the District Administrator ("D.A.") for District 1 for the Connecticut Department of Correction. In this position, Quiros oversaw eight Correctional Facilities: Cheshire CI, Enfield, CI Garner CI, MacDougall-Walker CI, Manson YI, Northern CI, Osborn CI and York CI. (Def. Ex. B, Quiros Decl. ¶2).

As District Administrator, Quiros was not involved in periodic reviews of inmates in the A/S program. *Id.* ¶8. This was done at the facility level. *Id.* ¶8. At all times relevant to this lawsuit he was assured that appropriate periodic reviews were conducted for inmates in the A/S program and at no time was there any reason for him to believe that the Plaintiff was not receiving appropriate periodic reviews. *Id.* ¶8. Although he was not directly involved in the regression process for inmates in the A/S process, occasionally he would be informed of and administratively approve regression based on the recommendation for inmates to be regressed.

In this case, he was informed of a recommendation to regress the Plaintiff to phase 1 of the A/S program by Captain Johnson, the Unit Administrator for the A/S unit at Cheshire CI in August 2015. *Id.* ¶10. At that time, Captain Johnson informed him that Plaintiff had been found with contraband on three occasions, and that information had been collected which indicated Plaintiff was manipulating his attorney to bring him contraband. Warden Erfe agreed with Captain Johnson's assessment. *Id. ¶10.* He relied upon their assessment and the information they gave him, which he had no reason to believe was inaccurate, when he informed them that he concurred with their recommendation. *Id. ¶10.*

The final decision to regress Plaintiff in 2015 was done by the Multidisciplinary Progression Team/Facility Classification Committee, which also completed periodic reviews of

inmates in A/S. He was not part of that team or committee. *Id. ¶11*. He does not recall being informed of or in any way involved in any other decisions to regress or progress the Plaintiff within the A/S program. *Id. ¶*11.

As District 1 Administrator, he reviewed Level 2 grievance appeals arising out of the facilities under his supervision. *Id. ¶*12. He did not receive, investigate, or respond to level 1 grievances. *Id. ¶*12.  He did not review or respond to appeals of classification or special management decision, including A/S placement, reviews, and regression decisions. *Id. ¶*13.  As District Administrator, he did not have the authority to overturn  a classification or special management decision, including A/S placement or regression. *Id. ¶*14. When reviewing Level 2 appeals of grievances, he would review the investigation and response done at the facility, by facility staff. *Id. ¶*15. He reviewed and responded to many Level 2 appeals filed by Plaintiff. *Id. ¶*16. At no time did he become aware of any errors or omissions in the due process provided to the Plaintiff regarding his A/S placement, progression, or regression, nor would he have had the authority  to overturn any classification or special management decisions if he had. *Id. ¶*16.

**Defendant David Maiga**

Since approximately February 2015, David Maiga was Acting Director/Director of Offender Classification and Population Management ("OCPM") for the Connecticut Department of Correction. Maiga has been the Director of OCPM since April 2015, and for approximately two months prior to April 2015, he was the Acting Director of OCPM. (Def. Ex. C, Maiga Decl. ¶2).

Maiga avers that he "was not involved in the Plaintiff's placement in Administrative Segregation (A/S) in 2013" or "any periodic reviews, regressions, or progressions of the Plaintiff, [or any inmates] in the A/S program." *Id.* at ¶¶4, 5

The review, regression, and progression process for A/S takes place at the facility level. Maiga states that he is not and was not involved in decisions to progress or regress inmates in the A/S program.  (Maiga Decl. ¶6). "For all times relevant to this lawsuit I was assured that the appropriate periodic reviews  were conducted for inmates in the A/S program. At no time was there was no reason for me [to] believe that the Plaintiff or any other inmates [were] not receiving appropriate periodic reviews." *Id.* ¶7.

He stated that,

> Typically all correspondence sent to my office would be screened by my administrative assistant. Inmate correspondence would be directed to the appropriate DOC personnel. This was done to ensure the correspondence was received by the DOC personnel who were in the best position to appropriately address the inmate's issues. Generally, Counselor Supervisor Tugie or Counselor O'Neill responded to any classification related correspondence, including correspondence related to the A/S program, directed to my office. I generally did not review or respond to such correspondence to my office because I delegated those duties.

*Id.* at ¶10. All correspondence sent to Director Maiga was screened by his administrative assistant and responded to on his behalf by staff members. Def. 56(a)(1) ¶10; Pl. 56(a)(2) ¶10. Three letters were sent to Plaintiff on Director Maiga's letterhead. Pl. Ex. JJ,  KK, MM. Two letters were sent to Plaintiff from Elizabeth Tugie, Counselor Supervisor Offender, Classification and Population Management dated November 2, 2015 and April 11, 2016. Pl. Ex. JJ, MM. One letter was sent to Plaintiff from Scott O'Neill, Correctional Counselor, Audits and Training Unit, Offender Classification and Population Management. Pl. Ex. KK.

"Classification appeals were and are reviewed, investigated, and responded to by [Counselor Supervisor] Tugie. I generally do not review, investigate, and respond to such appeals." *Id.* at ¶11.

### Defendant Edward Maldonado

Defendant Maldonado was the Warden at NCI from July 2011 to January 2014 (ECF No. 184 at 66, n. 9; Def. Ex. E, Maldonado Decl. ¶2). Plaintiff was transferred to NCI on December 3, 2013. (Pl. 56(a)(2) Stat. ¶3; Def. Ex. N, Maldonado Suppl. Decl. ¶¶3, 4, 8). He avers that he was "not involved in any of Plaintiff's periodic reviews, progression, or regression decisions because Plaintiff's initial placement in A/S took place on December 3, 2013, and I left NCI a month later." (Def. Ex. E, Maldonado Decl. ¶6).

From approximately April 1, 2016 through August 1, 2016, while assigned as Warden and stationed at Osborn, Maldonado assumed duties of Warden at NCI. (ECF No. 184-1, Maldonado Suppl. Decl. ¶¶4, 8). William Mulligan was promoted to Warden at NCI on August 1, 2016. *Id.* Between April 1 and August 1, 2016, the Warden duties Maldonado assumed at NCI included, among other things, reviewing NCI grievances and reviewing A/S periodic review recommendations.[4] *Id.* at ¶5.

He did not sit on the NCI A/S review panel, although he did review their recommendations. *Id.* at ¶¶6, 8. He avers that "[a]t no point in time did [he], or any other individual Warden within the DOC, have the authority or ability to remove the Plaintiff from A/S." *Id.* at ¶9. "Pursuant to the classification manual, at Plaintiff's reviews, the facility review panel could make a favorable recommendation for the Plaintiff to be removed from A/S. that recommendation would then be reviewed by the Warden and the D.A. for agreement or disagreement. The recommendation would then be forwarded to the Director of OCPM who could make the decision to release the inmate." *Id.* at ¶10. "Although Wardens had the ability to review a facility panel recommendation, the only individual officials that has the ability to

---

[4] Accordingly, the relevant time frame for Warden Maldonado was when he was from December 2013 to January 2014 and from April through June 2016.

remove an inmate from A/S or progress an inmate were the Commissioner or [his] Designee (the Director of OCPM), after the facility review panel had made a recommendation to do so." *Id.* at ¶11.

Maldonado averred that, "Although I could have disapproved or approved of a recommendation to remove Plaintiff from A/S while I was Warden at NCI, I could not remove him from that status myself." *Id.* at ¶12. "I did not ever disapprove of a recommendation for the Plaintiff to be released from or progressed through A/S." *Id.* at ¶13.

Maldonado retired on April 1, 2017. *Id.* at ¶1.

### 8th Amendment Claims Against Erfe, Maldonado, Cournoyer and Mulligan

Brown also alleges an Eighth Amendment claim against four supervisory defendants. They are Scott Erfe, former Warden of Cheshire CI and three former Wardens of NCI Edward Maldonado, Ann Cournoyer, and William Mulligan alleging that these defendants were deliberately indifferent to his mental health needs.

### Defendant Scott Erfe

Scott Erfe served as the Warden at Cheshire CI from December 2014 through March 28, 2019. (Def. Ex. A, Erfe Decl. ¶2). Prior to March 2014, Defendant Erfe served as the Warden at Corrigan-Radgowski CI from July 2010 through March 2014. *Id.*

### Defendant Ann Cournoyer

Ann Cournoyer served as the Warden at NCI from approximately 2014 to 2016. (Def. Ex. D, Cournoyer Aff. ¶2). Thereafter, Cournoyer served as Warden at Enfield Correctional Institution until her retirement in March 2018. *Id.* Cournoyer retired in March 2018. *Id.* ¶1.

### Defendant Edward Maldonado

As set forth above, the relevant time frame under consideration on the claims alleged by Plaintiff against Defendant Maldonado is when he was Warden at NCI from December 3, 2013 to January 2014 and the acting Warden from April through June 2016. With regard to the Eighth Amendment claims, Maldonado avers in his declaration the following facts. (Maldonado Decl., Def. Ex. E and Suppl. Decl., Def. Ex. N).

**Defendant William Mulligan**

William Mulligan served as Deputy Warden at NCI from November 18, 2011 through April 1, 2013, when he was reassigned to Enfield CI until approximately December 2013. (Def. Ex. F, Mulligan Decl. ¶1). Mulligan returned to NCI as Deputy Warden on January 1, 2014. *Id.* On August 1, 2016, he was promoted to Warden at NCI where he remained until April 1, 2017. *Id.*

**The Wardens**

Defendant Erfe avers that as the Warden at Cheshire CI, and Defendants Cournoyer, Maldonado, and Mulligan aver that as Warden at NCI, they

> did not receive, process, review, or respond to inmate medical grievances or health services reviews. The medical grievance process was handled by medical staff.
>
> [He] was not directly involved with the provision of medical or mental health care to inmates. Provision of medical and mental care was provided by State of Connecticut, University of Connecticut Correctional Managed Health Care (CMHC), not the DOC.
>
> Until July of 2018, medical and mental health staff, including medical doctors, were under the administration of UCONN CMHC, not the DOC. Accordingly, they were not under my administration or under the administration of any warden within the DOC. Neither any warden nor I had the authority to hire or terminate

11

medical staff or order medical staff to provide or deny medical and mental health care, or any specific course of treatment for any inmate.

I am not a medical doctor or mental health professional. I never made medical determinations about the treatment, care, or diagnoses of inmates, including the Plaintiff. I did not have the authority or ability to overrule medical providers and could not order that the Plaintiff or any other inmate receive any specific treatment, care, or diagnosis.

I relied upon medical and mental health staff to ensure that inmates, including the Plaintiff, were provided with proper medical care.

I do not recall any specific complaints regarding the Plaintiff's medical or mental health care.

To the extent I may have ever been made aware of any complaints regarding the Plaintiff's medical or mental health care. I would have referred them to medical or mental health staff, as I did with all inmates, because I am not a medical doctor and I did not make medical determinations about inmate care.

At all times relevant to Plaintiff's complaint, I was assured by medical and mental health staff that Plaintiff was not of risk of any serious harm, and he was being appropriately monitored and treated for any and all medical or mental health conditions. I had no reason to doubt these assurances.

(Def. Ex. A, Erfe Decl. ¶¶7-13; Def. Ex. D, Cournoyer Aff. ¶¶ 7-13; Maldonado Decl., Def. Ex. E ¶¶ 9-15 and Suppl. Decl., Def. Ex. N; Def. Ex. F, Mulligan Decl. ¶¶17-14).

## III.   STANDARD OF REVIEW

The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.' " *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)).

The inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S. Ct. 2505. Accordingly, the moving party satisfies its burden under Rule 56 "by showing ... that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*) (quotation marks omitted). Once the movant meets its burden, "[t]he nonmoving party must set forth specific facts showing that there is a genuine issue for trial." *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 n.2 (2d Cir. 2013) (quoting *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth "specific facts" demonstrating that there is "a genuine issue for trial. Fed. R. Civ. P. 56(e)." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting *Anderson*, 477 U.S. at 250, 106 S. Ct. 2505). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). The standard thus requires "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S. Ct. 2505 (citations omitted).

In assessing the presence or absence of a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (*per curiam*) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). "In

deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002)(citing *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505).

## IV.   DISCUSSION

### A.  Supervisory Liability

Since the parties completed briefing on this motion, our Court of Appeals addressed the standards for supervisory liability set forth in *Colon v. Coughlin,* 58 F.3d 865  (2d Cir. 1995), and the Supreme Court's decision in *Ashcroft v. Iqbal, 556* U.S. 662, 1299 S. Ct. 2042, 173 L. Ed.  (2009). *Tangreti v. Bachmann,* --- F. 3d ---, 2020 WL 77687688, at *1 (Dec. 28, 2020). The Court considered that in *Iqbal*

> A supervisor's "mere knowledge of his subordinate's discriminatory purpose" is not sufficient because that knowledge does not "amount[ ] to the supervisor's violating the Constitution." *[Iqbal].* at 677, 129 S. Ct. 1937. The Court explained that such a "conception of 'supervisory liability' "—according to which a supervisor may be held liable based on a lesser showing of culpability than the constitutional violation requires—is "inconsistent" with the principle that officials "may not be held accountable for the misdeeds of their agents." *Id.*

*Tangreti v. Bachmann*, No. 19-3712, 2020 WL 7687688, at *5.

In  *Tangreti* the Court disagreed with the conclusion set forth in *Colon,* and joined other Circuit courts

> in holding that after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S. Ct. 1937. "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

Tangreti, 2020 WL 7687688, at *6. In other words,

14

> [f]ollowing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009), courts may not apply a special rule for supervisory liability. Rather, the plaintiff must directly plead and prove that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676, 129 S. Ct. 1937.

*Id.*, 2020 WL 7687688, at *1. With this standard in mind, the Court will address the claims against six supervisory Defendants.

## B. Fourteenth Amendment Due Process Claim

Defendants first argue that Defendants Quiros, Maldonado and Maiga were not personally involved in any constitutional violation of Plaintiff's Fourteenth Amendment rights. Plaintiff alleges that the Defendants denied him due process in connection with his initial placement in the Administrative Segregation Program, Defendants failed to engage in regular periodic reviews during his continued confinement in A/S, and that Defendants did not provide him with hearings in connection with his transfers from Cheshire to Northern when they sent him back to a prior phase of the A/S Program.

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*). Here, Plaintiff alleges a liberty interest in avoiding confinement in Northern. *See* ECF No. 70 at 22 (citing *Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005)).

Once a liberty interest has been implicated, the court determines whether a plaintiff has received the procedural safeguards to which he was entitled before the deprivation of that liberty

interest occurred. Thus, the court considers whether the process provided to the plaintiff at the time of his initial placement in the Administrative Segregation Program was sufficient.

In *Hewitt v. Helms*, 459 U.S. 460 (1983)*,* the Supreme Court noted that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence" and that inmates "should reasonably anticipate" being confined in "administrative segregation" "at some point in their incarceration." *Id.* 468. The Court held that in connection with an inmate's placement on administrative segregation when "an inmate represents a security threat" or "pending completion of an investigation into misconduct charges against him," he or she "must merely receive some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 476. As long as these two requirements are met, the non-adversary proceeding is held "within a reasonable time following the inmate's transfer" to administrative segregation, "and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Id.* & n.8. In *Wilkinson*, 545 U.S. at 228-29, the Supreme Court concluded the "informal, nonadversary procedures set forth in . . . *Hewitt v. Helms*, 459 U.S. 460 (1983), constituted appropriate procedural safeguards for inmates faced with indefinite confinement in restrictive, maximum security prison.

**1.   District Administrator Quiros**

Plaintiff argues that questions of fact concerning defendant Quiros' personal involvement precludes summary judgment and pose a triable issue for Section 1983 liability. Defendant argues that the facts as alleged against former D.A. Quiros cannot "serve to establish *any*

personal involvement in a constitutional violation, because no constitutional violation occurred." (ECF No. 184 at 3).

### a. Initial A/S Placement

Plaintiff first contends that Quiros' personal involvement in a constitutional violation is established because he was notified of and signed off on Plaintiff's initial A/S placement. (ECF No. 183-55 at 16 (citing Pl. 56(a)(2) Stat.(disputed facts) ¶2 (citing Pl. Ex. AA and BB)). Defendant argues that, "[w]ith regard to Plaintiff's initial A/S placement, this cannot serve to establish *any* personal involvement in a constitutional violation because no constitutional violation occurred." (ECF No. 184 at 3). The Court agrees.

> The Supreme Court requires that an inmate sent to Administrative Segregation be afforded "some notice of the charges against him and an opportunity to present his views to the prison officials charged with deciding whether to transfer him to administrative segregation." *Hewitt v. Helms*, 459 U.S. 460, 476 (1983). Due process also requires that the decision be supported by "some evidence." *Superintendent Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985).

*Muniz v. Cook,* No. 3:20-CV-1533 (MPS), 2020 WL 7078715, at *4 (D. Conn. Dec. 3, 2020).

Here the undisputed facts show, and Plaintiff concedes, that he was initially placed on A/S only after receiving "notice, a hearing, and an opportunity to be heard." (ECF No. 183-5 at 5 ("Plaintiff was formally placed in A/S on December 3, 2013, following notice, a hearing and an opportunity to be heard.").[5] These minimal procedures are all that are required pursuant to *Hewitt*, 459 U.S. at 476 ("An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation."); *Banks v. Michaud*, No. 3:20-CV-00326 (JAM), 2020 WL 7188476, at *4 (D. Conn. Dec. 7, 2020)("For administrative segregation, less is

---

[5] There is no dispute that Plaintiff "had injured an inmate in an altercation at Corrigan." (ECF No. 183-5 at 5).

required; a prisoner must merely receive some notice of the basis for restrictive terms of confinement and an opportunity to present his views.").

Accordingly, summary judgment is **GRANTED** as to Defendant Quiros as to Plaintiff's initial A/S placement as a matter of law.[6]

### b. *Ongoing Due Process Violations*

Next, Plaintiff argues that Quiros' review of three grievances, that were denied by then-Wardens Maldonado and/or Mulligan, establishes personal involvement under *Colon*.[7] *See* ECF No. 1183-5 at 16-17 He first argues that personal involvement was established on July 8, 2016, when defendant Quiros "affirmed the warden's rejection of [his] grievance as untimely…." (ECF 183-5 at 16 (citing Pl.'s 56(a)(2) Stat. (disputed facts) ¶14, n.27 (citing Pl. Ex. GG)). Quiros states in the grievance,

> You filed a level 1 grievance regarding Classification Reviews at Northern CI. The response given by Warden Maldonado was appropriate. Grievances must be filed within 30 days of the occurrence or discovery of the cause of the grievance. Accordingly, you level 2 grievance is rejected. This grievance was filed

---

[6] As stated above, summary judgment will also enter in favor of Defendants Maldonado and Maiga as to Plaintiff's initial A/S placement as a matter of law. (Def. 56(a)(1) Stat. ¶¶5, 6; Pl. 56(a)(2) Stat. ¶¶5, 6).

[7] Plaintiff argues that

Quiros denied Plaintiff's grievances pertaining to no less than three ongoing due process violations: (1) the lack of meaningful periodic reviews as set forth in *Hewitt* and *Giano* cases, … in contravention of D.O.C. Administrative Directive §9.2; (2) the classification committee's persistent failure to review new information regarding the justification for Plaintiff's initial placement, namely his August, 2015 acquittal for the purported assault on another inmate; and (3) the absence of an administrative mechanism for regression from Phase 3 of A/S to Phase 1 (which was done to Plaintiff twice), even in the face of the warden's admission no such mechanism existed.

(ECF No. 183-5 at 17-18 (citing Pl.'s 56(a)(2) Stat. ¶¶12-15 and ¶¶18-20)).

improperly, therefore it is not exhausted, [and] does not meet the criteria to receive a level 3 review.

(Pl. Ex. GG).

Next, Plaintiff points to an August 18, 2016, Level 2 Grievance which was also denied by Quiros. (Pl. 56(a)(2) 15 (citing Pl. Ex. PP)). In this August 18, 2016, determination Quiros stated that

> You are appealing a level 1 grievance regarding Administrative Segregation Status at Northern C.I. Documentation provided does show that a recent court action has resulted in a not guilty finding stemming from an incident at C.R.C.C. on 11/3/2013. However, since placement on A.S. on 12/3/2013, you have received (25) Disciplinary Reports, of which (16) were Class "A" violations. The DOC has attempted on several occasions to progress you through the phase program of which you have adjusted poorly resulting in regressions back to Phase 1. As of your most recent Classification Review dated 8//1/2016, it has been decided to progress you to Phase 3 of A.S. I encourage you to keep a positive disciplinary history to ensure completion of the final phase of this program. Your level 2 grievance is denied.

(Pl. Ex. PP).

On December 6, 2016, Quiros rejected Plaintiff's Level 2 grievance stating,

> You are appealing a level 1 grievance regarding Administrative Segregation at Northern CI. The response given by Warden Mulligan was appropriate. While you attempt in your appeal to differentiate the two grievances referenced here (141-17-008, and 141-17-030), the body of this grievance (141-17-030) is repetitive to the arguments being made in (141-17-008). Additionally, since "initial" A.S. placement is subject to appeal of a Special Management Decision, this would not be considered to be a grievable matter and would be properly rejected. Your level 2 grievance is rejected.

(Pl. Ex. EEE).

Under *Tangreti*, the Court "may not apply a special rule for supervisory liability. Rather, the plaintiff must directly plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 2020 WL 7687688, at *1 (quoting *Iqbal* at 676, 129 S. Ct. 1937). Plaintiff has not made that showing.

As to the grievance decision dated July 8, 2016, Defendant Quiros denied Plaintiff's Level 2 Grievance regarding "Classification Reviews at Northern C.I." for a period from December 3, 2013 through November 24, 2015, affirming the Warden's finding that Plaintiff's May 9, 2016 grievance was filed "well beyond the allotted 30 days to file a grievance regarding these issues." (Pl. Ex. FF and GG)). Here the acts grieved by Plaintiff, classification reviews from May 2016 through November 2015, were remote in time and the grievance was untimely filed.

Similarly,  Quiros' affirmance of a denial of a Level 2 grievance on August 18,  2016 does not implicate the existence of an ongoing constitutional violation. (Pl. Ex. PP). Plaintiff's Level 1 grievance was filed on June 21, 2016, requesting reclassification of his risk level based on the existence of "new information." (Pl. Ex. OO).  The "new information", according to Plaintiff, was the August 5, 2015 acquittal on the criminal charges that were the reason for his placement in A/S in 2013.  *Id.* Plaintiff's Level 1 grievance was denied by the Warden on July 18, 2016, stating that "[t]he grievance must be filed within 30 calendar days of the occurrence or discovery of the cause of the grievance."  (Pl. Ex. OO). Here there is an absence of a Constitutional violation as the acquittal on the criminal charges in August 2015 was not new information in June 2016 and the filing of the Level 1 grievance was untimely. Quiros affirmed the Warden's rejection of the Level 1 grievance as untimely. Further, as noted by Defendant Quiros, the Classification Review decision on August 20, 2016, *progressed* Plaintiff to Phase 3 of A.S. (Pl. Ex. PP). In denying the Level 2 Grievance, Defendant Quiros further explained that, "since placement on A.S. on 12/3/2013, you have received  (25) Disciplinary Reports, of which, (16) were Class "A" violations. The DOC  has attempted on several occasions to progress you through the phase program of which you have adjusted poorly, resulting in regressions back to

20

Phase I." (Pl. Ex. PP). Quiros did not "personally progress[] Plaintiff to Phase 3 of A/S" as asserted by Plaintiff. (ECF No. 183-5 at 16). Rather, this statement is an explanation *not* a determination or adjudication on A/S status by Quiros.

Finally, the third Level 2 grievance reviewed by Quiros addressed the rejection by Warden Mulligan of a Level 1 finding that "[a] repetitive request for [] administrative remedy may not be filed by the same inmate when a final response had been provided and there has been no change in any circumstances that would affect the response or when the initial request for an administrative remedy is still in process." (Pl. Ex. DDD). In considering Warden Mulligan's Level 1 decision, Quiros affirmed the Warden's finding that the two grievances were repetitive and did not weigh in on the merits of the Special Management Decision, which he stated "would not be considered a grieveable matter and would be properly rejected." (Pl. Ex. EEE). Plaintiff appears to base his argument for personal involvement solely on the fact that "Quiros affirmed the warden's denial of the grievance on appeal." (ECF No. 183-5 at 17). This *pro forma* denial of a grievance - which is all that is argued, without more, does not create an issue of personal involvement in an ongoing Constitutional violation to survive summary judgment. *See Hidalgo v. Kikendall*, No. 08 CIV. 7536 (DC), 2009 WL 2176334, at *4 (S.D.N.Y. 2009)("The reason for this rule is clear:  'Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the Superintendent.'") (quoting *Thompson v. New York,* No. 99 Civ. 9875(MHD), 2001 U.S. Dist. LEXIS 9450, at 23-24 (S.D.N.Y. Mar. 14, 2001)). Plaintiff has not shown that Defendant Quiros' "own individual actions" rises to a Constitutional violation under the Fourteenth Amendment. *Tangreti,* 2020 WL 76876888, at *1 (quoting *Iqbal*, 556 U.S. at 676).

Accordingly, summary judgment will enter in favor of Defendant Quiros on Plaintiff's due process claims under the Fourteenth Amendment to the United States Constitution.

## 2. Maldonado

### a. *Ongoing Due Process Violations*

Plaintiff argues that the record "creates triable fact issues concerning Maldonado's participation in Plaintiff's A/S process in late 2013-early 2014 and in 2016, as well as his stymying Plaintiff's grievances protesting ongoing due process violations in 2016. (ECF No. 183-5 at 20-21).[8]

Maldonado states that while he was the Warden at NCI between December 2013 and January 2014, he "was involved in the periodic review process" and that Plaintiff did *not* undergo any periodic reviews until *after* he was "transferred to a new facility, approximately one month after Plaintiff's transfer to Northern…." (ECF No. 172-2, n. 1). This is undisputed. Nevertheless, Defendant Maldonado argues "[t]here is no constitutional requirement that an inmate receive weekly" or monthly reviews while in A/S. (ECF No. 184 at 7). The Court agrees.

> As an initial matter, the Court notes that, although Plaintiff attempts to make much out of the fact that his reviews appear to have sometimes been conducted with less frequency than every 60 days and without adequate notice for him to submit objections to the reviews (as required by DOCCS policy), such failures to adhere strictly to state or institutional policy are not sufficient to establish a constitutional violation. *See Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (noting that a violation of a state procedural statute alone, without a due process violation, "would not be enough generally to establish a constitutional claim"); *Sanders v. Gifford*, 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014) (report-recommendation of Treece, M.J., adopted by Kahn, J.) ("[E]ven

---

[8] Defendant Maldonado was the Warden at NCI from July 2011 to January 2014, and later assumed duties at NCI while he was the Warden at Osborne CI for approximately four months, April through August, in 2016. (ECF No. 184 at 66, n. 9). Plaintiff was transferred to NCI on December 3, 2013. (Pl. 56(a)(2) Stat. ¶3; Def. Ex. N). Accordingly, the relevant period when reviewing the time frame for Defendant Maldonado was when he was Warden and/or acting-Warden at NCI from December 2013 to January 2014 and from April through June 2016.

assuming that Defendant Graham deviated from state procedures or DOCCS Directives, a violation of such rules and regulations does not, standing alone give rise to liability under § 1983."); *Ahlers v. Nowicki*, 12-CV-0539, 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) (report-recommendation of Treece, M.J., adopted by Hurd, J.) ("[C]laims involving the improper adherence to proprietary facility policies are incognizible under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983."). Rather, as stated in *Hewitt* and *Proctor*, the Due Process Clause requires that the reviews be conducted only "periodically." The record establishes that the facility-level committee reviews were completed approximately every two months; therefore, the Court finds that there is no issue of fact that these reviews were conducted at least periodically and that they thus satisfy the constitutional requirement in that respect.

*H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 373 (N.D.N.Y. 2020)

Once a prisoner is placed in administrative segregation, prison officials must conduct a periodic review of the confinement to determine whether the prisoner remains a security risk. *Proctor* [v. LeClaire], 846 F.3d [597], 609 [2d Cir. 2017)]. Ford argues that he was denied appropriate reviews because the first review occurred 105 days after his placement in administrative segregation, rather than the 60 days provided in DOCCS regulations. But a mere violation of state regulations does not amount to a denial of due process under the Constitution. *Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987).

*Ford v. Deacon*, 793 Fed. Appx. 13, 17 (2d Cir. 2019); *see* (ECF No. 184 at 7, n.10 ("District Courts in this circuit have held that periodic reviews every four months is consistent with due process requirements, although annual reviews are likely insufficient." (citing *Alston v. Cahill*, No. 3:07-CV-4733 RNC, 2012 WL 3288923, at *9, n.9 (D. Conn. Aug. 10, 2012)(gaps of four months between reviews acceptable)); *Alston v. Chapdelaine*, No. 3:115-cv-434 (CSH), 2016 WL 543105, at *10 (D. Conn. Feb. 10, 2016)(one year without a periodic review states a claim)).

As for the period from April through June 2016, Maldonado states that he "reviewed NCI grievances and approved one facility periodic review, which resulted in Plaintiff's progression in A/S." (ECF No. 184 at 6, n.9). "It is well-established that inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures do[ ] not give rise to a cognizable § 1983 claim." *Solek v. Naqvi*, 2016

WL 7427213, at *3 (D. Conn. 2016) (internal quotation marks and citations omitted); *see Hidalgo*, 2009 WL 2176334, at *4 (The law is clear, however, that a prison official's "mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983.")(quoting *Swindell v. Supple,* No. 02 Civ. 3182(RWS), 2005 U.S. Dist. LEXIS 1517, at *32, 2005 WL 267725 (S.D.N.Y. Feb. 3, 2005)).


Defendant argues that "neither action alters former D.A. Maldonado's lack of personal involvement in this case. Regarding the latter, Plaintiff's argument is puzzling, given that D.A. Maldonado simply reviewed and approved a periodic review which  actually resulted in *progression* to less restrictive conditions of confinement." (ECF No. 184 at 6, n.9) (citing Pl. Ex. HHH at 1009-10; Pl. Ex. R; Pl. Ex. S).  Plaintiff has not shown that Defendant Maldonado's "own individual actions" rises to a Constitutional violation under the Fourteenth Amendment. *Tangreti,* 2020 WL 76876888, at *1 (quoting *Iqbal*, 556 U.S. at 676). Accordingly, summary judgment will enter in favor of Defendant Maldonado on Plaintiff's Fourteenth Amendment due process claims.

### 3. **Maiga**

#### a. *Ongoing Due Process Violations*

Plaintiff also fails to provide any evidence that Defendant Maiga's "own individual actions violated the Constitution." *Tangreti,* 2020 WL 76876888, at *1 (quoting *Iqbal*, 556 U.S. at 676).

During the timeframe at issue in the case, Defendant Maiga held the positions of Acting Director of OCPM from approximately February through March 2015 and Director of OCPM in April 2015. (Maiga Decl., Def. Ex. C ¶2). Plaintiff identifies three letters that he claims violated

his Fourteenth Amendment due process rights. (Pl. Ex. JJ, LL, MM). It is undisputed that all correspondence sent to Director Maiga was screened by his administrative assistant and were responded to on his behalf by staff members. Classification appeals were reviewed, investigated, and responded to by Counselor Supervisor Tugie or Correctional Counselor O'Neill, not Director Maiga. (Def. 56(a)(1) Stat. ¶¶10-11; Pl. 56(a)(2)Stat. (undisputed facts))¶¶10-11; Maiga Decl. ¶¶10 ("Generally, Counselor Supervisor Tugie or Counselor O'Neill responded to any classification related correspondence, including correspondence related to the A/S program, directed to my office."); ¶11 ("Classification appeals were and are reviewed, investigated and responded to by C/S Tugie."). Instead, Plaintiff argues that supervisory liability lies through the "doctrine of apparent authority as set forth in *Cefaratti v. Aranow,* 321 Conn. 59 (2016)," (Pl. 56(a)(2) (undisputed facts) ¶¶10-11 (citing Pl. Ex. JJ, LL, MM)).

Plaintiff's Exhibit JJ is a letter dated November 2, 2015, on State of Connecticut Department of Connecticut Offender Classification & Population Management letterhead with "David Maiga Director" in the upper left corner, from Elizabeth Tugie, Counselor Supervisor of Offender Classification and Population Management to Plaintiff. (Pl. Ex. JJ). After acknowledging Plaintiff's correspondence received on October 29, 2015, Ms. Tugie states

> On November 25, 2013 you had a restrictive status hearing where you met with Counselor Supervisor Griggs. This hearing was prompted by the serious physical assault that you were involved in on November 3, 2013. In your letter you state in part that "I was placed on A.S. for a fight with a prisoner which I wasn't found guilty for" You were indeed found guilty of a Class A disciplinary ticket for Assault on 11/3/13.
>
> Administrative Directive 9.4 Restrictive Status, Section 3, Subsection B defines Administrative Segregation as follows: **"Placement of an inmate on a restrictive housing status that results in segregation of the inmate whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population,"** The severe injury you caused

to another inmate, requiring emergency medical evacuation to an outside hospital, most certainly meets this definition.

Your classification and placement onto Administrative Segregation meets the criteria set forth in A.D. 9.4 as well as the Classification Manual.

(Pl. Ex. JJ (emphasis in original)).

Plaintiff's Exhibit LL is a letter dated February 22, 2016, on the same DOC letterhead, from Scott O'Neill, Correctional Counselor, Audits and Training Unit, Offender Classification and Population Management. (Pl. Ex. LL). After acknowledging receipt of Plaintiff's letter on February 18, 2016, Mr. O'Neill stated that "it had been forward[ed] to my office for response." *Id*. He stated,

You were placed onto Administrative Segregation, for this placement, on 12-3-13 and notice served to you which you signed shortly thereafter. Your time frame for review under administrative remedies has long pas[sed].

Your judicial matter notwithstanding; there was and still remains myriad evidence to support a classification of an overall level 5. Your behavior then and continued behavior are clear indicators that your "…behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates…" you have been sanctioned for twenty-four (24) separate disciplinary violations since your classification to a level 5. If you ameliorate your misconduct and remain discipline free you will be afforded the program opportunity to progress through the phases of Administrative Segregation with the goal being your safe return to general population.

I encourage you to participate in program opportunities and refrain from disciplinary violations.

(Pl. Ex. KK).

The third letter is dated on April 11, 2016, on the same DOC letterhead, from Counselor Supervisor Tugie, Audits and Training Unit, Offender Classification and Population Management to Plaintiff. (Pl. Ex. MM). After acknowledging receipt of Plaintiff's letter dated March 18, 2016, Ms. Tugie states that "it was forwarded to my office for a response." *Id*.  She stated,

You have previously submitted your concerns to Director Maiga regarding your placement onto Administrative Segregation. As stated in prior correspondence, Administrative Directive 9.4 Restrictive State, Section 3,, Subsection B defines Administrative Segregation as follows: **"Placement of an inmate on a restrictive housing status that results in segregation of the inmate whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population."** This severe injury you caused to another inmate, requiring emergency evacuation to an outside hospital, most certainly meets this definition. The details of the incident were thoroughly reviewed by Director Lewis when he authorized placement.

You make mention of being found "Not Guilty" by the Court of the charges brought against you as a result of this assault. Again, the Department of Correction is looking at your behavior while incarcerated and whether that poses a threat to the orderly operations of the facility. Your continued disruptive behavior is a clear indicator that placement on a restrictive housing status is appropriate. You have been sanctioned for twenty-five separate disciplinary violations since your classification to a level 5 on December 12, 2013. Should you decide to remain discipline free you will be afforded the opportunity to progress through the phases of the Administrative Segregation program ultimately reintegrating to general population.

I suggest you participate in the programs afforded to you, remain free of disciplinary infractions, and demonstrate that you are able to be managed safely in general population

(Pl. Ex. MM (emphasis in original)).

Plaintiff argues that he "sought redress through the ultimate decider of A/S status within D.O.C.," and received an answer "on the decider's letterhead" by employees authorized to speak for Maiga, "ratifying the refusal to review new information concerning the rationale for his initial A/S/ placement and substitution an entirely new rationale for continuing Plaintiff's A/S status." (ECF No. 183-5 at 19). He contends that these letters evidence two continuing alleged constitutional violations *and* creates "[a]n issue of fact [] as to Maiga's personal involvement which cannot be sloughed off onto underlings who spoke "for" him." *Id*. Defendant accurately states that Plaintiff has cited no caselaw which applies the doctrine of apparent authority to a §1983 claim, as "none exists." (ECF No. 184 at 8). That is because "[f]ollowing *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009, courts may *not* apply a special

rule for supervisory liability. Rather, the plaintiff must directly plead and prove that 'each

Government-official defendant, through the official's own individual actions, has violated the

Constitution." *Tangreti,* 2020 WL 7687688, at *1 (emphasis added)(citing *Iqbal*, 556 U.S. at

676, 129 S. Ct. at 1937). Plaintiff has made no evidentiary showing that Defendant Maiga

reviewed these letters. Importantly, if called to testify, Maiga will state that he did not "review or

respond" to classification related correspondence, including correspondence related to the A/S

program, directed to my office." (Pl. Ex. C ¶10).

> [M]ere factual allegations are insufficient to successfully oppose a motion for
> summary judgment. In any event, these letters, assuming that Defendant Bellnier
> in fact saw and read them (an assumption for which Plaintiff has pointed to no
> supporting evidence), do not constitute a basis for reasonably finding that
> Defendant Bellnier was personally involved in the alleged denial of adequate
> medical care. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002)
> ("[I]t is well-established that an allegation that an official ignored a prisoner's
> letter of protest and request for investigation of allegations made therein is
> insufficient to hold that official liable for the alleged violations.") (citing cases);
> *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (noting that courts
> generally find that merely writing a letter of complaint does not suffice to show
> personal involvement where the official merely receives a letter and passes it onto
> a subordinate for response or investigation); *accord, Wingate v. Gives*, 05-CV-
> 1872, 2009 WL 424359, at *7 n.4 (S.D.N.Y. Feb. 13, 2009).

*H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 376–77 (N.D.N.Y. 2020). "[M]erely pointing to

evidence of recent good behavior is insufficient if defendants can show that they 'reviewed and

either genuinely discredited [it or] found that [the inmate's] poor behavior outweighed it." '

*H'Shaka v. O'Gorman*, 758 Fed. Appx. 196, 199 (2d Cir. 2019)(quoting *Proctor v. LeClaire*, 846

F.3d 597, 613 n.9 (2d Cir. 2017)). Defendants have made that showing. As set forth above,

Plaintiff has not demonstrated that Maiga, through his own individual actions, has violated the

Fourteenth Amendment. *Tangreti,* 2020 WL 7687688, at *6.

Accordingly, summary judgment is granted in favor of Defendant Maiga on Plaintiff's Fourteenth Amendment due process claims.

### C. Eighth Amendment Claim-Deliberate Indifference to Mental Health Needs- Defendants Erfe, Maldonado, Cournoyer, and Mulligan

Brown also alleges an Eighth Amendment claim against four supervisory defendants: Scott Erfe, former Warden of Cheshire CI, and three former Wardens of NCI Edward Maldonado, Ann Cournoyer, and William Mulligan alleging that these defendants were deliberately indifferent to his mental health needs.[9] Defendants argue that there is no genuine issue dispute as to any material fact that they had any personal involvement in the provision of mental health care.

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. The Supreme Court has long recognized that prison officials violate the Eighth Amendment if they are deliberately indifferent to a substantial risk of serious harm or to the serious medical needs of a sentenced prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

A deliberate indifference claim under the Eighth Amendment has two requirements. First, the prisoner must allege that he was subject to an objectively serious risk of harm or serious medical need, as distinct from what a reasonable person would understand to be a minor risk of harm or minor medical need. Second, the prisoner must allege that a defendant prison official acted not merely carelessly or negligently but with a subjectively reckless state of mind akin to criminal recklessness (*i.e.*, reflecting actual awareness of a substantial risk that serious harm to the prisoner would result). *See Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019) (explaining that a sentenced prisoner must prove "that the charged official possessed 'a state of mind that is the

---

[9] "Plaintiff agrees with Defendants argument that this claim does not apply to Defendants Johnson, Robles, Lewis and Bachan." (ECF. No. 1883-5 at 22, n.5).

equivalent of criminal recklessness.' " (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.

1996)); *see also, e.g.*, *Spavone v. N.Y. State Dept. of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir.

2013); *Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012); *Collazo v. Pagano*, 656 F.3d 131, 135

(2d Cir. 2011) (*per curiam*).

Pursuant to the standard set forth in *Tangreti*, Plaintiff

> must therefore establish that [Defendants Erfe, Cournoyer, Mulligan and
> Maldonado] violated the Eighth Amendment by [their] own conduct, not by
> reason of [their] supervision of others who committed the violation. [He] must
> show that [the individual Defendant under consideration] "acted with 'deliberate
> indifference' "—meaning that [the Defendant] personally knew of and
> disregarded an excessive risk to [Plaintiff's] health or safety. *Id.* (quoting *Farmer*,
> 511 U.S. at 834, 114 S. Ct. 1970). [Plaintiff]cannot rely on a separate test of
> liability specific to supervisors. *See Whitson v. Stone Cty. Jail*, 602 F.3d 920, 928
> (8th Cir. 2010) ("These defendants are thus liable only if they *personally
> displayed* deliberate indifference to the risk that [the inmate] would be
> assaulted.") (emphasis added).

*Tangreti,* 2020 WL 7687688, at *6. Therefore, "for deliberate-indifference claims under the

Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the

supervisor had *subjective knowledge* of a substantial risk of serious harm to an inmate and

disregarded it. *See Farmer*, 511 U.S. at 837, 114 S. Ct. 1970." *Tangreti*, 2020 WL 7687688, at

*4 (emphasis added).

Defendants state that "[u]ntil July of 2018, medical and mental health staff, including

medical doctors, were under the administration of UCONN CMHC, not the DOC." [10]  (Def.

56(a)(1) Stat.  ¶21). As a result, Defendants argue that they "had no authority over mental health

---

[10] Correctional Managed Health Care ("UCONN CMHC") is a division of the University of
Connecticut Health Center. *See Jolly v. Corr. Managed Health Care*, Case No. 3:04-cv-1582
(RNC), 2009 WL 233667, at *3 (D. Conn. Jan. 30, 2009) ("CMHC is a division of a state
agency, the University of Connecticut Health Center." (citation omitted)).

providers and could not order any provider to provide treatment or any specific course of treatment to the Plaintiff." (ECF No. 184  at 1-2 (citing Def. 56(a)(1) Stat.  ¶24)).

Plaintiff argues that Defendants are bound by DOC Administrative Directives §§9.4(16)(A) and (16)(D), "presumably directed exclusively at D.O.C. personnel, including wardens, [] mandates mental health reviews of inmates in A/S weekly for the first two months of solitary confinement, and every three months thereafter or as is deemed clinically necessary. (ECF No. 183-5 at 21  (citing. Pl. 56(a)(2) Stat. ¶4). Brown argues that Defendants' "[f]ailure to ensure that the directives are followed therefore implicates personal involvement." (ECF No. 183-5 at 22). However, the allegation that these Defendants failed to enforce the DOC's own Administrative Directives pertaining to Mr. Brown at the summary judgment stage, without more, is insufficient to raise a disputed issue of material fact. *See Michalski v. Erfe*, No. 3:17-CV-2074 (VAB), 2019 WL 5965204, at *13–14 (D. Conn. Nov. 13, 2019) (bare allegation that supervisory defendants failed to follow their own Administrative Directives sufficient at the Initial Review phase to allege a Constitutional violation).

Nevertheless, Defendants argue, and the Court agrees, that Brown has not proferred evidence showing that any of the supervisory Defendants were personally involved in the provision or denial of mental health care to Plaintiff.  (ECF No. 184 at 2-3); *see Benjamin*, 794 F. App'x at 11 ("to satisfy the subjective component, a prisoner must show deliberate indifference, *i.e.*, that the charged official possessed 'a state of mind that is the equivalent of criminal recklessness.'") (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

As set forth below, the record on summary judgment does not support the inference that Defendants Erfe, Maldonado, Cournoyer, and Mulligan had the required subjective knowledge that Plaintiff was at a substantial risk of serious harm.

Plaintiff first states that in his last year in A/S at NCI he filed "an inmate request form directed at Mental Health Services, stating that he had been requesting a consultation for weeks and was ignored." (Pl. 56(a)(2) Stat. ¶21 (citing Ex. FFF (dated 2/16/16)). Plaintiff also stated that he spoke to Dr. Frayne and CPC Longo since returning to NCI in September 2015. *Id.* This form was reviewed by Psychologist Mark Frayne on February 23, 2016, stating, in part, "Since your admission to Northern, I had asked you repeatedly to meet privately and you did in fact agree twice [illegible].  You have [illegible] Mr. Longo, and today you were [illegible] by Dr. Gagne. You had [illegible] efforts 'save now'" Pl. Ex. FF. Plaintiff followed up with a Level 1 Grievance on March 25, 2016, directed at Health Services, stating in part that "in the six months since his second regression back to Phase 1 A/S at NCI, he had only been seen by mental health staff three times, and that in the more than two years he had been in A/S, he had only had eight such consultations total." (Pl. 56(a)(2) Stat. ¶21 (citing Ex. GGG (dated 2/16/16)). This Level 1 Grievance was rejected on April 14, 2016 by then-Warden Maldonado because the appeal was outside the 15-day appeal deadline and was thus untimely. (Pl. Ex. HHH.)

Plaintiff's claim against Maldonado is based on the sole allegation that his signature appears on Plaintiff's Level 1 Grievance denial. *See* Pl. 56(a)(2) Stat. ¶22. This bare allegation is insufficient to establish that Maldonado acted with deliberate indifference to Plaintiff's health and safety.

> "[A]n administrator's response to a medical issue is insufficient to establish deliberate indifference if the administrator himself never provided medical care, since prison administrators may defer to medical staff regarding medical treatment of inmates." *Lewis v. Cunningham*, No. 05-CV-9243(GBD/RLE), 2011 WL 1219287, at *5 (S.D.N.Y. Mar. 14, 2011) (internal citation omitted), *aff'd*, 483 Fed. Appx. 617 (2d Cir. 2012). Further, "affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca*, No. 01-CV-5178(KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007); *see also Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("The fact that the

> Superintendent Greiner affirmed the denial of plaintiff's grievance—which is all
> that is alleged against him—is insufficient to establish personal involvement or to
> shed any light on the critical issue of supervisory liability, and more particularly,
> knowledge on the part of the defendant." (quotation marks and citation omitted) ).

*Green v. Maldonado*, No. 3:17-CV-00957 (CSH), 2018 WL 2725445, at *6 (D. Conn. June 6,

2018). Plaintiff has not shown that Defendant Maldonado's "own individual actions" rises to a

Constitutional violation under the Eighth Amendment. *Tangreti,* 2020 WL 76876888, at *1

(quoting *Iqbal*, 556 U.S. at 676). Accordingly, summary judgment is granted as to Defendant

Maldonado on this Eighth Amendment claim.

The Court also finds that summary judgment should enter as to Plaintiff's Eighth

Amendment claims against former NCI Wardens Maldonado, Cournoyer and Mulligan and

former Cheshire CC Warden Erfe on the claim that their failure to follow Administrative

Directives §9.4(16)(A). Plaintiff admits that defendants Maldonado, Cournoyer, Mulligan and

Erfe are not medical or mental health professional and were not directly involved in the

provision of medical or mental healthcare. (Pl. 56(a)(2) Stat. ¶¶25, 26). Rather, Plaintiff argues

that these Defendants

> were obligated to ensure that D.O.C. Administrative Directives §§9.44(16)(A),
> Attachment B and 9.4(16)(D), mandated scheduled psychological reviews for
> inmates placed in A/S, were observed by mental health staff. Ex. B. Plaintiff filed
> an inmate request form with  Defendant Counselor Longo concerning the lack of
> mandatory mental health reviews that was received on 2/9/2016. Ex. FFF. He
> filed a Level 1 health services grievance on the same subject matter that was
> received on 2/17/2018. Ex. GGG.

(Pl. Stat. 56(a)(2)(undisputed facts) ¶¶ 26, 27, 29, 30; *see* also Pl. Stat. 56(a)(2)(disputed

facts) ¶¶21, 22).

In a related argument, Plaintiff also argues that "the Defendants Maldonado, Cournoyer,

Erfe, and Mulligan should have been mindful of their ministerial obligation to ensure that

Plaintiff received periodic mental health reviews pursuant to §9.4(16)(A) and (D) in light of their

actual knowledge of his prior mental health history while in custody." (ECF No. 183-5 at 22).

Plaintiff states that prior to his placement in A/S, he spent several years housed in Garner

Correctional Institution, from September 7, 2007 through June 17, 2011, which is "reserved for

inmates with significant mental health issues." (Pl. Stat. 56(a)(2)(undisputed facts) ¶30; Pl. Stat.

56(a)((2)(disputed facts) ¶23; ECF No. 183-5 at 22-23). "Because of Plaintiff's prior placement

at Garner, Defendants knew or should have known that he had a mental health history that

mandated, once he was in A/S, scrupulous attention to his mental health care needs in

accordance with Administrative Directives §9.4's mandated periodic mental health reviews." (Pl.

Stat. 56(a)(2)(undisputed facts) ¶30; ECF No. 183-5 at 23).

Here, Defendant Erfe became Warden at Cheshire CC in December 2014, over three

years *after* Plaintiff was transferred out of Garner CI. Plaintiff was transferred to A/S at Northern

in November 2013, *before* Erfe assumed the position. Defendant Maldonado became Warden at

NCI in November 2013, two years *after* Brown was released from Garner.  Similarly, the

remaining Defendants were Warden at NCI  years *after* Plaintiff's release from Garner CI.

Defendant Cournoyer took over as Warden at NCI in January 2014; Maldonado assumed duties

as Warden from April 2016; and Mulligan took over as Warden in August 2016. Simply put,

there is no evidence to suggest that these Defendants were aware of Plaintiff's mental health

treatment at Garner or that the Administrative Directives were not followed, or of the claimed

denial of mental health care, let alone personally involved in the denial of such care.  As

previously stated, is undisputed that these Defendants are not medical or mental health

professionals and were not directly responsible for the provision of medical or mental health

care. (Pl. 56(a)(2) ¶¶25, 26). The mere contention that Defendants Erfe, Maldonado, Cournoyer

and Mulligan "knew or should have known" that Plaintiff had mental health treatment at Garner

years before his being housed in a facility under their supervision or that the Administrative

Directives were not followed is insufficient to create a genuine issue of fact to survive summary

judgment.

Plaintiff also argues that "a failure to adhere" to the administrative directives is

"tantamount to direct participation in the violation" to show "requisite personal involvement for

§1983 liability for Plaintiff's Eight Amendment deliberate indifference to health care

needs."(183-5 at 23). The Court disagrees. Plaintiff provides no caselaw or facts to support this

argument.  A defendant cannot be held personally liable for a constitutional violation by other

defendants simply based on a "high position of authority in the prison system." *Wright v. Smith*,

21 F.3d 496, 501 (2d Cir. 1994). Defendants correctly argue that there is no evidence to suggest

that Defendants Erfe, Maldonado, Cournoyer, or Mulligan "were ever aware of Plaintiff's

claimed denial of mental health care, let alone personally involved [in] the alleged denial of such

care." [ECF No. 172-2 at 14; *see* ECF No. 172-2 at 12 (citing *Lewis v. Cunningham*, No. 05 CIV.

9243 GBD RLE, 2011 WL 1219287, at *7, (S.D.N.Y. Mar. 14, 2011) ("A high ranking official's

inaction is, by itself, insufficient to satisfy the requirement of personal involvement, especially

when plaintiff's claims involve medical concerns that may be appropriately delegated to medical

staff."))]. Finally, as set forth in *Tangreti*,

> To hold a state official liable under § 1983, a plaintiff must plead and prove the
> elements of the underlying constitutional violation directly against the official
> without relying on a special test for supervisory liability. In the context of the
> Eighth Amendment, that requires a showing of deliberate indifference on the part
> of the state-official, and the pretrial record in this case cannot meet that standard.

*Tangreti*, 2020 WL 7687688, at *7. "A party opposing a properly supported motion for summary

judgment may not rest upon 'mere allegations or denials' asserted in his pleadings, *Rexnord*

*Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir. 1994), or on conclusory allegations or

unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998)." *Wilson v. Int'l*

*Bus. Machines, Inc.*, 323 F. Supp. 2d 370, 372 (N.D.N.Y. 2004). Plaintiff has not shown that Defendants Erfe, Maldonado, Cournoyer and Mulligan's "own individual actions" rise to a Constitutional violation under the Fourteenth Amendment. *Tangreti,* 2020 WL 76876888, at *1 (quoting *Iqbal*, 556 U.S. at 676).

Accordingly, summary judgment will enter in favor of Defendants Erfe, Maldonado, Cournoyer, and Mulligan on Plaintiff's claim of deliberate indifference to mental health needs under the Eighth Amendment to the United States Constitution.

## V.      CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment **[ECF No. 174]** is **GRANTED**.

The Motion for Summary Judgment is **GRANTED** as to Defendants Maiga and Maldonado on the due process claims under the Fourteenth Amendment arising out of Plaintiff's initial A/S review. It is undisputed that Defendants David Maiga and Edward Maldonado were not involved in the Plaintiff's initial placement in A/S in November 2013, and they were not involved in the hearing process for Plaintiff's placement in A/S in 2013. (Def. 56(a)(1) Stat. ¶¶5, 6; Pl. 56(a)(2) Stat. ¶¶5, 6).

The Motion for Summary Judgment is **GRANTED** as to Quiros on the due process claims under the Fourteenth Amendment arising out of Plaintiff's initial A/S review.

The Motion for Summary Judgment is **GRANTED** as to Defendants Quiros, Maldonado and Maiga under the Fourteenth Amendment arising out the ongoing due process violations.

The Motion for Summary Judgment is **GRANTED** as to Defendants Erfe, Maldonado, Cournoyer, and Mulligan on Plaintiff's claim of deliberate indifference to mental health needs under the Eighth Amendment to the United States Constitution.

The Motion for Summary Judgment is **GRANTED** as to Defendants Dr. Frayne, Dr. Gagne and Counselor Longo on all due process claims under the Fourteenth Amendment arising out of Plaintiff's placement in Administrative Segregation. (TAC ¶¶48, 49). Plaintiff agrees that Defendants Dr. Frayne, Dr. Gagne and Counsel Longo "had no personal involvement in [Plaintiff's] initial placement in A/S, his A/S reviews, or his A/S regressions." (ECF No. 183-5 at 21, n. 2).

The Motion for Summary Judgment is **GRANTED** as to Defendants Johnson, Robles, Lewis and Bachan on the Eighth Amendment claim alleging deliberate indifference to mental health needs. (TAC ¶50). "Plaintiff agrees with Defendants' argument that this claim does not apply to Defendants Johnson, Robles, Lewis and Bachan." (ECF No. 183-5 at 22, n. 5).

The Motion for Summary Judgment is **GRANTED** as to all Defendants on the Eighth Amendment claim alleging deliberate indifference to unconstitutional conditions of confinement. (TAC ¶51). "Plaintiff acknowledges that he filed no grievances as to specific conditions of confinement required for adjudication of an Eighth Amendment claim…." (ECF No. 183-5 at 23).

### <u>Remaining Claims</u>

The following claims were *not* the subject of this motion and remain for trial. Defendants did not move for summary judgment on: (1) the Fourteenth Amendment claims alleging a violation of due process as to Defendants Erfe, Cournoyer, Mulligan, Lewis, Bachan, Johnson, and Robles (TAC ¶¶48, 49; ECF No. 184 at 1, n. 1).; and (2) the Eighth Amendment claim alleging deliberate indifference to mental health needs as to Defendants Dr. Frayne, Dr. Gagne and Counselor Longo. (TAC ¶49; ECF No. 184 at 10, n. 11).

This is not a Recommended Ruling.  The parties consented to proceed before a United States Magistrate Judge (ECF No. 85) on December 7, 2018, with appeal to the Court of Appeals.  Fed. R. Civ. P. 73(b)-(c).

The Clerk is directed to enter judgment consistent with this ruling.

SO ORDERED, this 13th day of January 2021, at Bridgeport, Connecticut.

_/s/ William I. Garfinkel_
WILLIAM I. GARFINKEL
United States Magistrate Judge